**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-2398

CALLIXTE JEAN MARIE NTAMACK,

        Petitioner,

    v.

ERIC H. HOLDER, JR., United States Attorney General,

        Respondent.

On Petition for Review of an Order of the Board of Immigration
Appeals.

Argued: January 29, 2010        Decided: March 30, 2010

Before TRAXLER, Chief Judge, NIEMEYER, Circuit Judge, and
Jackson L. KISER, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

Petition for review denied by unpublished per curiam opinion.

**ARGUED:** Danielle L. C. Beach-Oswald, BEACH-OSWALD IMMIGRATION
LAW ASSOCIATES, PC, Washington, D.C., for Petitioner. Carol
Federighi, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Respondent. **ON BRIEF:** Amy M. Grunder, BEACH-OSWALD
IMMIGRATION LAW ASSOCIATES, PC, Washington, D.C., for
Petitioner. Tony West, Assistant Attorney General, William C.
Peachey, Assistant Director, Office of Immigration Litigation,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The Board of Immigration Appeals ("BIA") denied the application of Callixte Ntamack, a native and citizen of Cameroon, for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and withholding or deferral of removal under the Convention Against Torture ("CAT"), based on the statutory "persecutor bar" to relief and on Ntamack's failure to demonstrate that he will be tortured if returned to Cameroon. The BIA found that Ntamack had been a longtime member of Cameroon's national gendarmerie and judicial police force and had "ordered, incited, assisted, or otherwise participated" in the persecution of others based on grounds protected by the INA.

Because the BIA's findings are supported by substantial evidence in the record, we deny Ntamack's petition for review.

I

After completing high school in 1983, Ntamack became a member of Cameroon's gendarmerie and entered two years of professional schooling and training. Upon completion of that schooling and training, he served variously as an investigator, a noncommissioned officer in the anti-gang unit, and a judicial police officer. After 14 years of service, Ntamack fled

3

Cameroon in 1999 and entered the United States on a 6-month nonimmigrant visa, where he sought asylum.

During the years in which Ntamack was a member of the gendarmerie and judicial police, the State Department country reports for Cameroon and reports from human rights organizations indicated that these organizations frequently committed human rights abuses, including unlawful killings, the use of harsh interrogation techniques, and torture. In his application for asylum, however, Ntamack stated that he was opposed to these abuses and refrained from using the violent interrogation techniques employed by his colleagues. While acknowledging that the government falsely accused innocent people for political ends, Ntamack also denied that he participated in such cases. He justified his continued membership in the gendarmerie and the judicial police with his need to support his wife and six children.

Shortly after entering the United States, Ntamack filed an application for asylum, but his application was denied. Because he was, at the time, still lawfully within the United States, removal proceedings were not initiated against him.

In June 2002, Ntamack again applied for asylum, and again his application was denied. At this time, however, his case was referred to an immigration judge as he had overstayed his visa. While Ntamack conceded removability at the hearing before the

4

immigration judge, he requested asylum, withholding of removal under both the INA and the CAT, and deferral of removal under the CAT. In support of his application, Ntamack testified that he had been imprisoned three times in Cameroon for insubordination and suspicion of supporting the opposition to the government. He stated that, on each occasion, his superiors believed that he was supporting the opposition because of his unwillingness to engage in repressive conduct, and on each occasion he was interrogated and beaten.

His first imprisonment was in 1991, when his unit was sent to suppress a demonstration in the province of Bamenda. Rather than employ violent tactics, as he was ordered to do, Ntamack falsely claimed to be suffering from a stomach ache and was sent to a military hospital for testing. When the medical reports showed no evidence of a problem, Ntamack was imprisoned for insubordination, questioned about his political opinion, and accused of sympathy with the opposition. During this stay, he was handcuffed, tied up, beaten, and whipped while being interrogated. When he was tried, however, he was acquitted due to a lack of evidence, and, after being given a few days in the hospital to rest, he was allowed to return to work.

The second imprisonment occurred in 1992, when Ntamack was dispatched with his unit to quell a student demonstration at the University of Yaounde, during which the students were demanding

5

democratic reforms and freedom. Ntamack stated that while he attempted to persuade his colleagues to refrain from violence and sought to negotiate with the students, his pleas were rejected. Instead, members of his unit arrested, beat, and wounded some of the students. Describing his own role during the demonstration, Ntamack stated, "We made a line and we start[ed] going towards the students, and we start beating on those who did not want to obey the order." When asked to be more specific about his own actions, he stated, "I held myself back a bit. Since (indiscernible) student divided the campus, I tried (indiscernible) some of the group and asked them to go back, to go back into the classroom." Upon his return to headquarters, Ntamack was again questioned about his political opinions and accused of not actively participating in orders to disperse the students. Ntamack was again imprisoned for insubordination and, he claimed, was beaten and interrogated under all kinds of conditions -- "bright lights day and night." When he was taken before a tribunal, he was again acquitted for lack of evidence, and again he returned to work in the gendarmerie.

Ntamack was imprisoned the third time in 1997 when he was assigned to assist at polling stations during the presidential election. After he told election observers about irregularities and ballot-box tampering, his superiors questioned him about his

political views.  He was again sent to prison, interrogated, and beaten to the point of unconsciousness.  Ntamack remained in prison until August 1999, when, with the assistance of friends, he escaped.  He stated that a friend, who worked at the prison, opened the cell, permitting Ntamack to exit through the front of the building.  Two friends waited there in a car and drove him away.  He then went into hiding, where he remained for approximately a month, before departing for the United States.

In addition to giving his own testimony at the hearing, Ntamack also presented the testimony of Anne Catherine Enane, who confirmed some of what Ntamack stated, especially about the events at the University of Yaounde.  He also presented documentary evidence in the form of prison discharge documents, letters from relatives, and the State Department country reports for Cameroon.

After the hearing, the immigration judge denied Ntamack's application for asylum, withholding of removal under the INA, and withholding of removal and deferral of removal under CAT. The judge found Ntamack's testimony not to be credible for several reasons.  The judge noted that Ntamack's testimony lacked detail about certain events and was inherently inconsistent -- he testified to imprisonment and mistreatment, yet he was allowed to remain a member of the gendarmerie. Indeed, he was even promoted, becoming a member of the judicial

7

police.  The immigration judge also found discrepancies between Ntamack's story and that of Enane.

On the merits, the immigration judge ruled that Ntamack had not suffered past persecution because of his political opinions. Rather, his imprisonment and mistreatment were due to his insubordination.  The immigration judge also found that Ntamack had failed to make a showing under CAT that it was more likely than not that he would be tortured if returned to Cameroon, observing that nothing in the record indicated the government's ongoing interest in him.  The judge acknowledged that Ntamack might have to serve a sentence upon his return, but that such punishment would be a legal response to his escape.

The immigration judge found that even if Ntamack had made the necessary showing for relief, the judge would deny relief because Ntamack was a persecutor, barring relief by statute. The judge found that the gendarmerie was a persecutory organization that had committed acts of violence against the students based on their political beliefs.  While the judge acknowledged that Ntamack had attempted to withdraw himself somewhat from violent actions, he nonetheless found that Ntamack was "part of these units where people [were] being questioned, harmed, and beaten, and therefore, [was] also part of the persecutory arm of government."  The immigration judge rejected Ntamack's financial justification for remaining with the

8

gendarmerie and determined that Ntamack had failed to carry his burden of demonstrating that he was not a persecutor.

On appeal, the BIA affirmed. It stated that it did not need to address the immigration judge's adverse credibility determination because Ntamack was statutorily barred from relief because he was a persecutor. While recognizing that mere membership in a persecutory organization was insufficient to bar relief, the BIA noted that Ntamack had furthered persecution through his inaction toward other members of his unit committing acts of persecution, his participation in the imprisonment of others, and his assistance in making a show of force toward the protesting students. In view of this evidence of persecution, the BIA ruled that Ntamack had failed to meet his burden of showing, by a preponderance of the evidence, that the "persecutor bar" did not apply.

In addition, the BIA affirmed denial of Ntamack's request for deferral of removal under CAT because Ntamack had failed to demonstrate that it was more likely than not that he would be tortured upon his return to Cameroon.

From the BIA's decision, Ntamack filed this petition for review, contending (1) that the BIA erred in finding him a persecutor; (2) that the evidence showed that it was more likely than not that he would be tortured on his return to Cameroon; and (3) that the Department of Homeland Security and the State

9

Department, in their investigation of his claims abroad, violated his right to confidentiality, protected by 8 C.F.R. § 208.6.[*]

                                II

We review the BIA's factual findings under the substantial evidence standard, reversing only if the evidence compels a contrary finding. 8 U.S.C. § 1252(b)(4)(B).

For his principal argument on appeal, Ntamack challenges the BIA's determination that he engaged in persecutory conduct, thus barring him from eligibility for asylum and withholding of removal, under both the INA and CAT.

The "persecutor bar" precludes the applicant from asylum and withholding of removal upon a finding that "the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." See 8 U.S.C. § 1158(b)(2)(A)(i) (asylum); see also id. § 1231(b)(3)(B)(i) (withholding removal under the INA); 8 C.F.R. § 1208.16(d)(2) (withholding removal under CAT).

_____

[*] Ntamack also seeks to challenge the immigration judge's adverse credibility finding. But because the BIA expressly declined to consider the immigration judge's credibility determination, the issue is not properly before us. "[O]nly the findings and order of the BIA, not those of the IJ," are before us on appeal. Li Fang Lin v. Mukasey, 517 F.3d 685, 687-88 & n.2 (4th Cir. 2008).

Physical participation in the persecution of others is not required for the persecutor bar to apply. Rather, the test is whether the applicant's conduct objectively furthered the persecution of others. See Higuit v. Gonzales, 433 F.3d 417, 421 (4th Cir. 2006); In the Matter of Federenko, 19 I. & N. Dec. 57, 69 (BIA 1984) (holding that alien's subjective intent is irrelevant and that persecutor bar applies if the objective effect of alien's actions is to further persecution, even if in some "small measure"). If "evidence indicates" that the applicant assisted or otherwise participated in persecution, the burden then shifts to the applicant to prove by a preponderance of the evidence that he did not contribute to the alleged persecutory acts. 8 C.F.R. §§ 208.16(d)(2), 1208.16(d)(2); see also Higuit, 433 F.3d at 420-21.

We conclude that, in this case, the record contains substantial evidence to support the BIA's finding that Ntamack's actions objectively furthered persecution. Ntamack testified to his participation in quelling a student uprising at the University of Yaounde by being more than a bystander. He stated that "we" -- referring to the gendarmes, of which he was one -- beat the students and stood in a line driving them back. Although he did state that he "held [him]self back a bit," this statement is insufficient to remove him from the persecutory conduct. While he may have demonstrated some hesitation about

repressive action and his participation may have been less forceful than that of others, the fact remains that he stated that he participated in the line pushing back and beating students.

In addition, Ntamack furthered persecution simply by his participation in what appears to be a phalanx or show of force by the gendarmerie against the students. An alien's physical presence can provide assistance in persecution when that presence impedes the movement of those persecuted or otherwise subjects them to an increased risk of harm. See, e.g., Federenko, 19 I. & N. Dec. at 69 (unwilling Nazi prison guard furthered persecution); Alvarado v. Gonzales, 449 F.3d 915, 928-29 (9th Cir. 2006) (applicant's presence and participation in persecutory interrogation furthered persecution); Negele v. Ashcroft, 368 F.3d 981, 983-84 (8th Cir. 2004) (Nazi guard who merely patrolled perimeter of concentration camp furthered persecution). Thus, Ntamack's presence in the line that herded and attacked students could well, by itself, have supported the BIA's finding of persecutory conduct.

Ntamack argues that the BIA erroneously concentrated on the facts of his membership in a persecutory organization and the length of that membership. While it is true that the BIA recited those facts, which can indeed be relevant, see Higuit, 433 F.3d at 421 (citing Singh v. Gonzales, 417 F.3d 736, 740

12

(7th Cir. 2005)), the BIA did not rely solely on his membership to support the persecutory bar. Rather, it relied on Ntamack's actual participation in the effort to quell the uprising at the university.

Ntamack also argues that even if his actions furthered violence against the students, the record reflects that the gendarmerie was acting to control a riot, rather than attack a legitimate political demonstration. Accordingly, he reasons that the gendarmerie was not acting in a persecutory manner because it did not seek to harm the students on account of a ground protected by the INA. The record, however, belies this contention. Statements by Ntamack and others demonstrate that the students were agitating in favor of democracy and freedom and that the gendarmerie was sent to quell opposition to the ruling party.

Finally, Ntamack contends that the BIA failed to credit his "redemptive acts," such as his warning Enane of the coming raid on her dormitory and his urging others to negotiate or return to their classrooms. But this evidence does not eliminate the evidence that Ntamack himself aided some persecution, and only some amount is necessary for the persecutor bar to apply. Stated otherwise, while Ntamack's redemptive activities show that he was less than sympathetic with the repressive goals of

13

his unit, they do not compel the conclusion that the persecutor bar should not apply.

At bottom, substantial evidence supports the BIA's conclusion that Ntamack is statutorily barred from receiving asylum and withholding removal under the INA and CAT.

III

Ntamack also challenges the BIA's decision to deny him deferral of removal under 8 C.F.R. § 1208.17(a), which provides that removal may be deferred when an alien demonstrates that "he or she is more likely than not to be tortured" if removed. "Torture" is defined as "an extreme form of cruel and inhuman treatment" that occurs by or with the consent or acquiescence of "a public official or other person acting in an official capacity." Id. § 1208.18(a)(1)-(2). It does not include "pain or suffering arising only from, inherent in or incidental to lawful sanctions [such as] judicially imposed sanctions and other enforcement actions authorized by law." Id. § 1208.18(a)(3).

The BIA found that Ntamack had failed to show that it was more likely than not that he would be tortured. While there is evidence in the record that Ntamack was imprisoned three times for insubordination and suspicion that he was supporting the political opposition, the degree of mistreatment that he

14

suffered is not totally clear. He did testify that he was interrogated under difficult conditions, beaten (once to unconsciousness), and otherwise mistreated while in prison, but his testimony also indicates that he was subjected to mistreatment during the initial phase of his incarceration and only to incarceration thereafter. Moreover, he never sought extensive medical attention as a result of his treatment by authorities. And following the first two imprisonments, he was released and allowed to return to work as an employee of the government. The BIA concluded that Ntamack's mistreatment did not rise to the extreme level of "torture" as defined under CAT. The BIA also found that no evidence indicated that the government had any interest in him now, if he were to return, except perhaps to punish him for escape. We conclude that the BIA's determination, while a close call, is nonetheless supported by substantial evidence because it cannot be said that the record compels a contrary conclusion, as required by 8 U.S.C. § 1252(b)(4)(B). Accordingly, we also affirm the BIA's decision on deferral.

IV

Finally, Ntamack claims that the overseas investigation into the authenticity of his prison release orders, which was conducted by the Department of Homeland Security and the State

15

Department, violated his right to confidentiality, protected by 8 C.F.R. § 208.6(a). He argues that we should remand this case to the BIA so that he can pursue this claim further.

Ntamack did not, however, raise this argument before the immigration judge or the BIA, and therefore we do not have jurisdiction to consider the issue. "A court may review a final order or removal only if the alien has exhausted all administrative remedies available to the alien as of right . . . ." 8 U.S.C. § 1252(d)(1); see also Asika v. Ashcroft, 362 F.3d 264, 267 n.3 (4th Cir. 2004) (failure to raise an argument before the BIA is failure to exhaust all remedies under the statute).

For the foregoing reasons, we affirm the decision of the BIA and deny Ntamack's petition for review.

PETITION FOR REVIEW DENIED

16